___ FILED    ___ ENTERED
____ LOGGED ____ RECEIVED

3:36 pm, Apr 17 2026
AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____C.M._____Deputy

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

PUTHUGRAMAM CHIDAMBARAN,

Defendant.

CRIMINAL NO. TJS-26-MJ-950

## GOVERNMENT'S MEMORANDUM IN SUPPORT OF DETENTION

The United States of America, by and through Kelly O. Hayes, United States Attorney for the District of Maryland, and Bijon A. Mostoufi, Assistant United States Attorney, submit the enclosed letter in support of the Defendant's detention pending trial.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

____/s/_____
Bijon A. Mostoufi
Assistant United States Attorney



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JPL:JBD/KRA
F. #2024R00799

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 17, 2026

By ECF and E-Mail

The Honorable Nicholas G. Garaufis
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

The Honorable Nathanael Cousins
United States Magistrate Judge
Northern District of California
280 South First Street
San Jose, California 95113

The Honorable Timothy J. Sullivan
United States Magistrate Judge
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Re:     United States v. Puthugramam Chidambaran and Sayyed Farhan Ali Naqvi
        Criminal Docket No. 26-97 (NGG)

Dear Judge Garaufis, Judge Cousins, and Judge Sullivan:

The government respectfully submits this letter in support of its motion that the Court detain the defendants Puthugramam Chidambaran and Sayyed Farhan Ali Naqvi pending trial in this matter. The defendants are charged with running a scheme, spanning more than five years, to systematically and repeatedly defraud lenders and investors in iLearningEngines, Inc. ("iLearning"), with estimated losses well in excess of $100 million dollars.

The defendants pose both a significant risk of flight and of obstruction of justice. Both defendants—who are not United States citizens—face mandatory prison terms of at least ten years, to be followed by almost certain removal; have an extensive network of foreign contacts and resources that they could use to flee; and have already destroyed evidence or told others to do the same. Both have also demonstrated an unrepentant willingness to use lies and to deceive others to benefit themselves and their co-conspirators.

No condition or combination of conditions will reasonably assure the Court that Chidambaran and Naqvi will appear to face the overwhelming proof of their guilt at trial. The defendants should therefore be detained pending trial.

I.    Offense Conduct

The government proffers the following facts concerning the defendant's offense conduct.  See United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (holding that government may proceed by proffer in detention hearing); United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995) (same); United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986) (same).

A.    The Fraudulent Scheme

As alleged in the indictment, iLearning was a Bethesda, Maryland-based technology company founded in 2010 by Chidambaran.  iLearning marketed itself as "an out-of-the-box AI platform that empowers customers to 'productize' their institutional knowledge and generate and infuse insights in the flow-of-work to drive mission critical business outcomes." iLearning claimed to earn revenue primarily by selling licenses for its platforms to customers. The company reported rapidly growing revenues that reached $421 million in 2023.

In April 2024, iLearning became a publicly traded company.  In connection with its going-public transaction, iLearning also obtained $40 million in loan proceeds from the New York City branch of a financial institution.  Shortly thereafter, iLearning obtained an additional $20 million in loan proceeds from the New York City branch of another financial institution. Following its going-public transaction, iLearning's shares began trading on the Nasdaq under the ticker symbol "AILE," and the company quickly achieved a market capitalization of approximately $1.5 billion.

Unbeknownst to investors and lenders, however, iLearning fabricated virtually all of its customer relationships and revenues.  The defendants inflated iLearning's revenues through an intricate web of sham contracts with purported customers—often purportedly worth tens of millions of dollars per year.  The agreements were often signed by iLearning employees or family members of iLearning employees posing as senior executives of the purported customers.  The defendants and others at iLearning then created fake information about those purported customers, including, for example, creating a website for a shell entity, to deceive investors and lenders into believing that iLearning's customers were real.  In other cases, the defendants convinced friends and associates of iLearning executives to enter into sham contracts with iLearning and to lie to iLearning's auditor, potential investors, and lenders on iLearning's behalf.

To make it appear as though iLearning was actually generating revenues from its sham contracts, the defendants "round tripped" money that iLearning received from lenders and investors—sending those funds to purported customers, who, in turn, would send that money back to iLearning.  For example, at Chidambaran's direction, an associate of Chidambaran, who previously worked as an iLearning vice president, incorporated and opened bank accounts in the names of several purported iLearning customers.  Over the course of several years, the defendants transmitted millions of dollars from iLearning to an account controlled by this individual.  This individual then sent those funds to other accounts he controlled in the names of other entities, before ultimately sending the money back to iLearning.  The value of these round-trip transaction in the aggregate exceeded $144 million.

2

During the course of the conspiracy, in April 2023, Naqvi prepared a "Request for Multiple Entry Business Visa" to submit to the U.S. Consulate in Dubai, United Arab Emirates, for an iLearning executive ("Executive A"). In that request, Naqvi falsely represented that Executive A was a "customer representative" of a third-party company who needed to travel to the United States for business meetings.

In August 2024, an investment research firm issued a report (the "Investment Research Report") alleging that iLearning had materially misrepresented its revenue, including by attributing a significant portion of its reported income to undisclosed related-party transactions. Following the publication of that report, iLearning's stock price declined precipitously, erasing a substantial portion of its market value. When questioned about the contents of the short-seller report, the defendants repeatedly lied to their investors and lenders about the nature of iLearning's relationship with its largest customers—including by repeatedly denying that its largest purported customer was actually an entity controlled by the defendants and others at iLearning—and directed representatives of their purported customers to lie on their behalf. iLearning ultimately filed for Chapter 11 bankruptcy protection in the District of Delaware in December 2024, and the proceedings were later converted to a Chapter 7 liquidation in 2025, marking the collapse of the company.

Prior to iLearning's collapse, both Chidambaran and Naqvi profited significantly from their scheme. In connection with iLearning's going-public transaction, Chidambaran received more than $500 million-worth of iLearning common stock and subsequently received approximately $12.5 million in iLearning restricted stock units. Likewise, Naqvi was awarded iLearning common stock worth approximately $11.2 million, and iLearning paid out nearly $4.5 million in cash to cover his tax liabilities.

Even after iLearning filed for bankruptcy and the defendants resigned from the company, both Chidambaran and Naqvi attempted to restart the fraudulent scheme. Specifically, Naqvi emailed Chidambaran and others in May 2025 about attempting to "bring[] in" a new investor who would provide $2.5 million for their fraudulent venture, which Naqvi said was contingent on Chidambaran and other co-conspirators' willingness to "play ball."

B.   Chidambaran and Naqvi's Efforts at Obstruction and Witness Tampering

After the publication of the Investment Research Report and the opening of the government's investigation, the defendants took additional steps to conceal the scheme and their role in it. Chidambaran and Naqvi spoke repeatedly on an encrypted messaging platform—with each other and other members of the conspiracy—in an apparent effort to coordinate what they would tell counsel for iLearning's special committee of the board ("Special Committee Counsel"), which had begun investigating the Investment Research Report's allegations. When Naqvi met with Special Committee Counsel, he provided them with electronic devices that bore evidence of intentional deletion of materials. Special Committee Counsel concluded that both Chidambaran and Naqvi were not truthful during their interviews.

Likewise, by May 2025, Chidambaran had learned specifically about a subpoena issued by a grand jury in the Eastern District of New York seeking information related to iLearning's collapse. After learning about that subpoena, Chidambaran repeatedly directed

3

another individual ("Individual A")[1] to delete or otherwise make unavailable information relevant to the grand jury's investigation.

## II.    Procedural History

On April 15, 2026, a grand jury sitting in the Eastern District of New York returned an indictment charging Chidambaran and Naqvi for their crimes in connection with their operation of iLearning. The indictment specifically charges the defendants with (1) running a continuing financial crimes enterprise, in violation of 18 U.S.C. § 225 (Count One); (2) securities fraud conspiracy, in violation of 18 U.S.C. § 371 (Count Two); (3) securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff (Count Three); (4) wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count Four); and (4) wire fraud affecting a financial institution, in violation of 18 U.S.C. § 1343 (Counts Five through Ten). See ECF Dkt. No. 1 (the "Indictment").

Both defendants were arrested earlier today—Chidambaran at his home in Potomac, Maryland, and Naqvi at a hotel in San Jose, California.

## III.    Legal Standard

In deciding whether to release or detain a defendant, a court "must undertake a two-step inquiry." United States v. Friedman, 837 F.2d 48, 49 (2d Cir. 1988). "It must first determine by a preponderance of the evidence that the defendant either has been charged with one of the crimes enumerated in Section 3142(f)(1) or that the defendant presents a risk of flight or obstruction of justice." Id. "Once this determination has been made, the court turns to whether any condition or combination of conditions of release will protect the safety of the community and reasonably assure the defendant's appearance at trial." Id.

If the court finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," the court "shall order" a defendant detained. 18 U.S.C. § 3142(e)(1). The government bears the burden of persuading the court by a preponderance of the evidence that the defendant presents a risk of flight or obstruction of justice, or by clear and convincing evidence that the defendant is a danger to the community. United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001); United States v. Friedman, 837 F.2d 48, 49 (2d Cir. 1988).

The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including "the person's character"; and (4) the nature and seriousness of the danger posed by the defendant's release. See 18 U.S.C. § 3142(g). In evaluating dangerousness, courts consider not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the

---

[1]    Individual A has provided information to the government in connection with this investigation. The government understands that Individual A has been providing information to the government in the hopes of receiving a favorable outcome in connection with the investigation.

4

community.'" United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).

IV.    Argument

    A.    The Defendants Are Eligible for Detention Under Section 3142(f)

For the reasons set forth below, the government submits that the defendants pose a serious risk of flight and obstruction of justice and are therefore eligible for detention under 18 U.S.C. §§ 3142(f)(2)(A)-(B).

    B.    The Defendants Pose a Significant Risk of Flight

As an initial matter, no condition or combination of conditions can mitigate the extraordinary risk of flight posed by the defendants.

First, the defendants face significant sentencing exposure, giving them a strong incentive to flee. See United States v. Zhang, 55 F.4th 141, 151 (2d Cir. 2022) (explaining that "[t]he prospect of a severe sentence can create a strong incentive for a defendant to flee and thereby avoid that sentence"). If Chidambaran and Naqvi are convicted at trial, each faces a mandatory-minimum sentence of ten years, and a maximum sentence of life imprisonment. Indeed, the government's current estimate of the Guidelines range the defendants will face is, in fact, life imprisonment.[2] Courts have recognized that even a significantly shorter potential sentence can warrant a risk-of-flight finding. See United States v. Scali, 738 F. App'x 32, 33 (2d Cir. 2018) ("The court reasonably determined that Scali's Guidelines range of 87-108 months' imprisonment was significant enough to provide an incentive to flee."); United States v. Khusanov, 731 F. App'x 19, 21 (2d Cir. 2018) ("[E]ven if, as a practical matter, Khusanov's maximum sentence exposure were only 15, rather than 30, years' imprisonment, that would still be sufficient to provide him with a strong incentive to flee."); United States v. Williams, No. 20-CR-293 (WFK), 2020 WL 4719982, at *2 (E.D.N.Y. Aug. 13, 2020) (Guidelines range of "92 to 115 months' imprisonment" gave defendant "a strong incentive to flee"). Moreover, because neither defendant is a United States citizen, and each faces the likely prospect of removal upon conviction, they have even less of an incentive to remain here pending trial.

---

[2]    The government's initial estimate of the Guidelines is premised on a base offense level of 7 pursuant to U.S.S.G § 2B1.1(a)(1); a 28-point enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(M) (loss of more than $250 million); a two-point enhancement pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i) (more than 10 victims); a two-point enhancement pursuant to U.S.S.G. § 2B1.1(b)(10)(B) (substantial portion of scheme committed outside the United States); a two-point enhancement pursuant to U.S.S.G. § 2B1.1(b)(17)(A) (more than $1 million from a financial institution); a four-point enhancement pursuant to U.S.S.G. § 3C1.1(c) (organizer or leader); and a two-point enhancement pursuant to U.S.S.G. § 3C1.1 (obstruction of justice), for a total offense level of 47. Assuming a criminal history category of I, this would yield an initial Guidelines range of life imprisonment. This estimate is not binding on the government and is subject to change.

5

Second, the evidence of the defendants' guilt is extremely strong, giving them further incentive to flee. See Zhang, 55 F.4th at 151 (explaining that where the evidence of a defendant's guilt is strong, "it follows that the defendants face an elevated risk of conviction (and of the attendant punishment), and therefore may present an elevated risk of flight"); United States v. Sabhnani, 493 F.3d 63, 76 (2d Cir. 2007) (finding detention appropriate because, in part, "the evidence of [the defendants'] guilt, both direct and circumstantial, appears strong"); United States v. Bruno, 89 F. Supp. 3d 425, 431 (E.D.N.Y. 2015) ("When evidence of a defendant's guilt is strong, and when the sentence of imprisonment upon conviction is likely to be long a defendant has stronger motives to flee."). The allegations in the Indictment—which make up just a portion of the government's proof—are largely drawn from documents uncovered over the course of the ongoing investigation. The documentary proof irrefutably shows that the defendants and their co-conspirators consistently provided false information to investors and lenders. Chidambaran and Naqvi's own emails and texts—and, in Chidambaran's case, recorded conversations—show that Chidambaran and Naqvi knew the information they and co-conspirators were providing was false. Those texts, emails, and recordings include (1) communications about creating sham contracts to account for revenue projections previously sent to potential investors; (2) communications about creating false narratives and information about purported customers; (3) communications illustrating that both defendants knew individuals claiming to be high-level executives at purported customers were, in fact, mid-level iLearning employees (including, most notably, an iLearning assistant vice president, who worked under Chidambaran and Naqvi); and (4) communications directing purported customers to provide demonstrably false information to auditors, investors, and lenders.

Third, the evidence shows that Chidambaran and Naqvi have the means to act on these strong incentives to flee. See Sabhnani, 493 F.3d at 76 ("a second factor strengthens the case for detention: defendants' ample means to finance flight"). Both Chidambaran and Naqvi received significant payments from iLearning and facilitated substantial payments to their co-conspirators, and the government's investigation into the full disposition of the tens of millions obtained from victims remains ongoing. Moreover, both defendants have an extensive network of contacts—including numerous co-conspirators in the underlying fraud—in both India and the United Arab Emirates who appear to have access to significant financial resources. The defendants' contacts abroad include Chidambaran's brother, who, upon learning of the government's investigation, left the United States and apparently has no intention to return. Moreover, Naqvi has already shown his willingness and ability to submit false information to secure immigration documents for one of those individuals, and there is every reason to believe he would do so for himself and Chidambaran here. The risk that the defendants could use their extensive network abroad to facilitate their flight therefore further justifies detention here.

Fourth, the seemingly ceaseless pattern of dishonesty shown by Chidamabran and Naqvi in their conduct in this case, as well as their efforts to obstruct the investigation, demonstrate that they cannot be trusted to return to court as required. See United States v. Raniere, No. 18-CR-204 (NGG), Mem. & Order at 13-14 (E.D.N.Y. 2018) (risk that defendant would commit future crimes or obstruct justice weighed in favor of detention); United States v. Nouri, No. 07-CR-1029 (DC), 2009 WL 2924334, at *2 (S.D.N.Y. Sept. 8, 2009) (Chin, D.J.) (finding defendant presented "substantial risk of flight" based, in part, on "dishonest and obstructive conduct," including "commit[ing] fraud on his investors"). For their own personal benefit, the defendants lied practically daily for nearly half a decade, including directly to the

6

faces of people who believed they were their friends and colleagues, and to countless investors, lenders, and auditors. There is no reason to believe that any promise to return to court should be accepted.

Accordingly, the government submits that the Court should find by a preponderance of the evidence that Chidambaran and Naqvi pose a serious risk of flight warranting detention.

2.     Risk of Obstruction

In addition, no condition or combination of conditions can mitigate the serious risk of obstruction of justice posed by the defendants.

The Court may find a risk of obstruction based on a "risk that [a defendant] will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror." 18 U.S.C. § 3142(f)(2)(B). Here, the defendants have already attempted to obstruct justice and tamper with witnesses. See 18 U.S.C. § 1512(b)(1) (criminalizing "knowingly . . . corruptly persuad[ing] another person . . . with the intent to influence, delay or prevent the testimony of any person in an official proceeding"); 18 U.S.C. § 1519 (criminalizing "knowingly alter[ing], destroy[ing], mutilat[ing], conceal[ing], cover[ing] up, falsif[ying], or mak[ing] a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States").

The defendants' history of obstruction in this case is extensive. Both have attempted to influence and coordinate witnesses' stories. Both have provided false statements to lawyers investigating their misconduct. Naqvi appears to have intentionally deleted, or attempted to intentionally delete, relevant evidence from electronic devices, while Chidambaran has told at least one other witness to do so. The government submits that the defendants' demonstrated history of obstruction in this case and risk that they will continue to obstruct justice or interfere with witnesses warrants detention here. See Raniere, No. 18-CR-204 (NGG), Mem. & Order at 13-14 (risk that defendant would commit future crimes or obstruct justice weighed in favor of detention).

V.     Conclusion

These two defendants—facing lengthy prison sentences and all-but certain removal upon release—have no incentive to appear for trial. They have the means, connections, and other resources to flee to jurisdictions from which they would likely never be returned. And they have made absolutely clear that they are willing to lie, falsify or destroy documents, and enlist others to help them, so long as doing so helps themselves. For these reasons and the others set forth above, the government respectfully submits that no condition or combination of

7

conditions the Court could set would reasonably assure the defendants' appearance and that they should both be detained pending trial.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:    /s/_____

Joshua B. Dugan
Kamil R. Ammari
Assistant U.S. Attorneys
(718) 254-6000

cc:    Clerk of the Court (NGG) (by ECF)
Counsel of Record (by ECF)

8